### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

                                   Case No. 08-CR-1412

v.

SILVESTRE REYES FILICIANO,

       Defendant.

### MEMORANDUM OPINION AND ORDER

Silvestre Reyes Filiciano, who is currently housed at the medium security Federal Correctional Institution in Victorville, California ("FCI Victorville Medium I"), has applied for compassionate release, in the form of his immediate release from custody, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Dkt. 142. In support, Mr. Reyes Filiciano cites various medical issues that he has experienced during his confinement, as well as the risk of serious harm or death he faces given the ongoing existence of COVID-19. *Id*. at 13–19. The Government opposes the motion. Dkt. 143. As set forth in the remainder of this Order, the Court **GRANTS** Mr. Reyes Filiciano's request, reducing his term of imprisonment to time served, and recommends that Immigration and Customs Enforcement ("ICE") begin removal proceedings immediately.

### BACKGROUND

On June 5, 2008, the government charged Mr. Reyes Filiciano and two other men—Daniel Gonzales Orduño and Luis Javier Rodriguez Parra—in a criminal complaint with Conspiracy to Possess with Intent to Distribute 500 grams and more of a Mixture and/or Substance Containing Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and Aiding and Abetting, in violation of 18 U.S.C. § 2. Dkt. 1. The government

subsequently indicted Mr. Reyes Filiciano and his coconspirators on three counts: 1) Conspiracy

under 21 U.S.C. § 846, 2) Possession with Intent to Distribute 500 grams and more of a Mixture

and Substance Containing Methamphetamine and Aiding and Abetting under 21 U.S.C. §§

841(a)(1), (b)(1)(A) and 18 U.S.C. § 2, and 3) Carrying a Firearm During and in Relation to a

Drug Trafficking Crime and Aiding and Abetting under 18 U.S.C. §§ 924(c)(1)(A) and 2. Dkt.

17. The Honorable Bruce D. Black was assigned the case. Minute Entry for June 24, 2008.

### I.     Mr. Reyes Filiciano participated in a short-lived conspiracy to distribute methamphetamine.

The charges against Mr. Reyes Filiciano, Mr. Gonzales Orduño, and Mr. Rodriguez Parra

involved a conspiracy to effectuate the sale of methamphetamine to an undercover Drug

Enforcement Administration ("DEA") agent. Final Presentence Investigation Report ("PSR"

(Dkt. 142-1)) ¶ 9. As described in the PSR adopted by Judge Black at sentencing, the

investigation of this conspiracy began on May 20, 2008, when DEA agents met with a

confidential source ("CS") who indicated that they knew of someone looking to sell large

quantities of methamphetamine. PSR ¶ 10. The CS provided the agents with a telephone number

for the individual and notified them that he drove a black and grey Ford truck. *Id*. The CS also

promised to give him the agent's cellular telephone number so that he could get in touch

regarding a sale. *Id*.

Later that day, DEA agents received a call from the individual in question, subsequently

identified as Daniel Gonzales Orduño, and spoke to him about purchasing multiple pounds of

methamphetamine. PSR ¶ 11. The two discussed price ($16,000/pound), purity (70%), and

logistics (the agent purportedly lived in Oklahoma). *Id*. Mr. Gonzales Orduño notified the agent

that he currently had approximately two and a half pounds, and the agent made it clear that he

would call back when he received enough money to purchase the methamphetamine. *Id*. From

the start, it appeared as though Mr. Gonzales Orduño was directing the operation.

The DEA agent called Mr. Gonzales Orduño back the following day, disclosing that he was still waiting for the funds but was interested in purchasing four pounds of methamphetamine. PSR ¶ 12. Mr. Gonzales Orduño told the agent that he was out but would have more by the following Monday or Tuesday. *Id*. He added that his product sold very quickly, and that he largely worked on a "per order" basis. *Id*. The two went on to discuss pick-up logistics in Albuquerque, including Mr. Gonzales Orduño representing that he would soon be in possession of a vehicle with a compartment that could hold up to ten pounds of concealed drugs. PSR ¶ 13. Mr. Gonzales Orduño told the agent that he would call him when the vehicle arrived. *Id*.

On May 26, the agent received that call from Mr. Gonzales Orduño. PSR ¶ 14. The two discussed the logistics of the proposed meeting, and Mr. Gonzales Orduño asked if the agent was okay with receiving only four pounds of methamphetamine (though more was reportedly arriving). *Id*. Later that day, in another phone call between the two (this time placed by the agent), the agent confirmed that everything was in place for the two to meet in Albuquerque on May 28. PSR ¶ 15. However, on the day the transaction was supposed to occur, the agent received a call from Mr. Gonzales Orduño indicating that there was a problem with the transport vehicle. PSR ¶ 16. A new transmission would have to be installed, and he would call the agent back once the vehicle was on its way to Albuquerque. *Id*. In this conversation, Mr. Gonzales Orduño also gave the agent advice on the best days to travel from Oklahoma in order to avoid being stopped by law enforcement. *Id*.

On June 3, the agent received a telephone call from Mr. Gonzales Orduño, who stated that "they" were leaving and would be back in Albuquerque by the evening. PSR ¶ 17. Mr.

Gonzales Orduño asked if the agent would be willing to meet the following morning. *Id*. The agent agreed, and Mr. Gonzales Orduño told the agent to call him when he arrived in Albuquerque. *Id*. The next day, the agent traveled to the Home Depot parking lot on Coors Boulevard in Albuquerque in anticipation of the meeting. PSR ¶ 18. The agent called Mr. Gonzales Orduño from the parking lot and notified him of his location. *Id*. Mr. Gonzales Orduño indicated that he needed to pick up the order and that he would call back soon. *Id*. A short time later, the agent received a call from Mr. Gonzales Orduño, who stated that he was going to send a *muchacho* (Spanish for boy and indicative of the drug operation's power structure) to meet the agent so that he could follow him to a trailer where the deal would take place. PSR ¶ 19. The agent then asked Mr. Gonzales Orduño if the *muchacho* would have the methamphetamine on him, to which Mr. Gonzales Orduño responded that he would and that he would show it to him. *Id*. Mr. Gonzales Orduño then disclosed that the *muchacho* would arrive in a black and grey Ford truck. *Id*. As the agent was speaking with Mr. Gonzales Orduño, the truck arrived and stopped behind the agent's vehicle. *Id*.

The agent exited his vehicle and motioned to the driver and only occupant of the truck, later identified as Luis Javier Rodriguez Parra, to park next to the agent's vehicle. PSR ¶ 20. He then approached Mr. Rodriguez Parra, who asked him to follow him to an alley because the parking lot was too exposed. *Id*. Instead, the agent asked Mr. Rodriguez Parra to quickly show him the methamphetamine before they continued with the transaction. *Id*. Mr. Rodriguez Parra did, but it was evidently only one pound. *Id*.; *see also* Dkt. 109 at 2. The agent asked Mr. Rodriguez Parra where the other three pounds were, to which Mr. Rodriguez Parra responded that it was just a sample (and it was all Mr. Gonzales Orduño told him to bring). PSR ¶ 20.

As a result, the agent called Mr. Gonzales Orduño about the other three pounds of

methamphetamine. PSR ¶ 21. Mr. Gonzales Orduño said it was risky to take all four pounds out and he assured the agent that he should be trusted. *Id*. Mr. Gonzales Orduño then instructed the agent to follow Mr. Rodriguez Parra to the trailer. *Id*. Upon completion of the call, the agent asked Mr. Rodriguez Parra where the trailer was located. PSR ¶ 22. Mr. Rodriguez Parra told him that it was on Coors Boulevard. *Id*. The agent feigned unfamiliarity with Albuquerque and asked Mr. Rodriguez Parra to give him a reference point. *Id*. Mr. Rodriguez Parra described the intersection of Coors and Rio Bravo Boulevards, where there was also a Walmart store. *Id*. The agent then told Mr. Rodriguez Parra that he needed to pick up his girlfriend who had the money, and that he would then drive to the Walmart and call Mr. Gonzales Orduño from there. *Id*. Mr. Rodriguez Parra agreed and departed the Home Depot parking lot. *Id*.

At approximately 1:25 p.m., the agent arrived at the Walmart parking lot. PSR ¶ 23. He placed a call to Mr. Gonzales Orduño, told him his location, and asked him to meet him there. *Id*. The agent told Mr. Gonzales Orduño that he needed to bring the methamphetamine to the Walmart. *Id*. Mr. Gonzales Orduño again assured the agent there was nothing to worry about. *Id*. Mr. Gonzales Orduño relayed that he was going to send the *muchachos* (plural) over to Walmart and that they would be driving the same black and grey truck. *Id*.

Around 1:45 p.m., the agent observed the truck enter the Walmart parking lot. PSR ¶ 24. Mr. Rodriguez Parra was driving. *Id*. There was, this time, also a passenger in the truck, later identified as Mr. Reyes Filiciano—the subject of this order but hitherto not present in the sequence of events. *Id*. Upon reaching the agent's vehicle, the men in the truck motioned to the agent to follow them. *Id*. The agent declined and told them to park next to his vehicle. *Id*. Mr. Rodriguez Parra did so. *Id*. The agent asked both individuals where the methamphetamine was, and Mr. Rodriguez Parra indicated that it was back at the trailer. *Id*. The agent then told Mr.

5

Rodriguez Parra that he was not going to the trailer until he saw all four pounds. *Id*. Both truck occupants reportedly sighed, rolled their eyes, and looked at each other. *Id*. Mr. Rodriguez Parra then told the agent to call Mr. Gonzales Orduño and ask him what he wanted to do. *Id*.

The agent telephoned Mr. Gonzales Orduño and told him that he wanted to see the methamphetamine and that his *muchachos* had not shown it to him. *Id*. Mr. Gonzales Orduño yet again told the agent to trust them. *Id*. The agent then asked Mr. Rodriguez Parra to at least show him the first pound of methamphetamine he had already seen at Home Depot one more time. PSR ¶ 25. Mr. Reyes Filiciano reportedly nodded his head towards the backseat of the truck and stated in Spanish: *está aquí* ("it is here"). *Id*. Mr. Rodriguez Parra then instructed Mr. Reyes Filiciano to show the methamphetamine to the agent. *Id*. Mr. Reyes Filiciano exited the passenger side of the truck, opened the third rear door of the extended cab portion of the truck, and reached underneath the seat and pulled out a plastic shopping bag. *Id*. He spread the plastic bag open with his hand and displayed four cylindrical packages wrapped in clear and green plastic wrap. *Id*. The agent then observed a black plastic gun box next to the plastic bag on the backseat floorboard. *Id*. At this time, the agent gave a pre-determined arrest signal and both Mr. Rodriguez Parra and Mr. Reyes Filiciano were taken into custody without incident. *Id*.

After the two were arrested, the agent asked Mr. Rodriguez Parra for the whereabouts of Mr. Gonzales Orduño. PSR ¶ 26. Mr. Rodriguez Parra responded that he did not know, but that he was driving a GMC Yukon. *Id*. Mr. Rodriguez Parra also provided oral and written consent to search his trailer at 3916 Blake Street. *Id*. A search of the trailer only produced miscellaneous paperwork. PSR ¶ 27. Agents then conducted a search of the Ford truck and found a black address book, a money gram receipt in the name of "Mario Landeros Altamirano" (an alias of Mr. Gonzales Orduño's) and two cellular telephones. *Id*.

The details of Mr. Gonzales Orduño's subsequent arrest further corroborate his primary role in the conspiracy. *See also* Dkt. 109 (in which the government refers to him throughout as "the primary co-defendant"). While the undercover officer was meeting with Mr. Rodriguez Parra in the parking lot of the Home Depot earlier that day, other agents set up surveillance to follow the Ford truck Mr. Rodriguez Parra was driving back to the location of where Mr. Gonzales Orduño was suspected to have been. PSR ¶ 29. After Mr. Rodriguez Parra departed the Home Depot parking lot, agents followed the truck to a trailer off of Coors Boulevard. *Id*. The agents observed several vehicles parked at the trailer, including a rust-colored GMC Yukon. *Id*. During surveillance of the trailer, agents observed the black and grey Ford truck and the GMC Yukon depart the trailer. *Id*. The agents followed the two vehicles until they got to the Walmart and then separated. *Id*. The Ford truck entered the Walmart parking lot, while the GMC Yukon continued straight on Coors Boulevard. *Id*.

Another agent was conducting surveillance in the general vicinity of Walmart when they observed the GMC Yukon traveling north on Coors Boulevard. PSR ¶ 30. The agent requested the assistance of a Bernalillo County Sheriff's deputy to conduct a probable cause traffic stop. *Id*. The deputy conducted a stop, during which the driver exited the vehicle and provided the officer and the agent with a New Mexico driver's license in the name of "Mario L. Altamirano" (the same name found on the money gram in the Ford truck). *Id*. A query through the New Mexico Motor Vehicle Department indicated no record on file. *Id*. The agent then observed several cellular telephones on the driver's seat. *Id*. The agent contacted the undercover agent who was involved in the drug transaction and asked him to call the telephone number he was using to communicate with Mr. Gonzales Orduño. *Id*. A few minutes later, the agent who conducted the traffic stop observed one of the telephones located on the driver's seat start ringing. *Id*. At this

time, law enforcement arrested Mr. Gonzales Orduño. *Id*.

The aforementioned investigation resulted in the seizure of approximately 2,601.2 gross grams of suspected methamphetamine from the Ford truck then-occupied by Mr. Rodriguez Parra and Mr. Reyes Filiciano. PSR ¶ 32. Additionally, agents seized a black gun box from the vehicle containing a Cobray MAC-II .9-millimeter handgun with two magazines and 19 bullets. *Id*. The gun was not loaded at the time of the seizure. *Id*. The facts adopted via the PSR, and the wordcount devoted to each participant, make it clear that Mr. Reyes Filiciano exercised the least amount of authority in this trio. Mr. Gonzales Orduño negotiated extensively with the agent regarding the drug transaction, provided logistical guidance, and directed his *muchachos* to deliver a sample of methamphetamine and bring the agent to a trailer for the full amount. *See also* Dkt. 37 ¶ 20 ("During [Mr. Rodriguez] Parra's interview, he indicated that [Mr.] Gonzales Orduño had told [him] to meet with [the agent] at Home Depot and later at [Walmart]."). Mr. Rodriguez Parra, meanwhile, appears to have acted more like a deputy, as he was sent to do the initial transaction, drove the truck, and directed Mr. Reyes Filiciano to show the agent the sample a second time. Additionally, "Luis Rodriguez Parra [reportedly] announced to the entire group that he was bringing *his* pistol for security to the deal." Dkt. 108 at 8:25–9:2 (emphasis added). Post-arrest interviews of Mr. Gonzales Orduño and Mr. Reyes Filiciano support this relative culpability determination.

On June 4, at the DEA office in Albuquerque, agents conducted an interview of Mr. Gonzales Orduño. PSR ¶ 33. Agents asked Mr. Gonzales Orduño whether he was willing to answer questions, to which he indicated that he was as he did not have any drugs on him. *Id*. The agents then played a few of the recorded telephone conversations between him and the undercover officer. *Id*. When asked, Mr. Gonzales Orduño remembered a specific call and

verified that it was his voice. *Id*. Mr. Gonzales Orduño then indicated that he was instructed by

an individual named "Chuy" to do some work for him; however, he did not know what kind of

work. *Id*. He added that he was provided with the cellular telephone that he used to communicate

with the undercover agent for the negotiation of the purchase of the methamphetamine. *Id*. Mr.

Gonzales Orduño further volunteered that he did not know anything about any drugs or a gun

that agents located. *Id*. Notably, the agents had not mentioned the gun to Mr. Gonzales Orduño

before he referenced it. *Id*.

The obfuscation continued. The agents then asked Mr. Gonzales Orduño who owned the

GMC Yukon he was driving, and he stated it belonged to a friend. PSR ¶ 34. He could not

provide agents with any additional information regarding this friend. *Id*. He also indicated that he

did not know who the owner of the black and grey Ford truck was, even though a receipt with his

alias was found in it. *Id*. Throughout the interview, he repeatedly stated that he did not have any

drugs in his direct possession—as if this somehow absolved him of guilt. *Id*. He offered no

further explanations for his telephone calls with the undercover agent or how they coordinated

the purchase and then seizure of approximately 2,601.2 gross grams of methamphetamine. *Id*.

That same day, also at the DEA office in Albuquerque, agents conducted a post-arrest

interview of Mr. Reyes Filiciano. PSR ¶ 35. He indicated that he had been arrested many times

before and was thankful that he was arrested this time and not killed. *Id*. The agents asked him

why he thought he would have been killed. *Id*. He explained that if the gun had been in his

hands, he knew the arresting team would have shot him. *Id*. The agent asked to whom the gun

belonged, and Mr. Reyes Filiciano stated that he did not know. *Id*. He added that he did not know

the gun was in the truck until he went to retrieve the methamphetamine. *Id*. He also described

illegally crossing into the United States eight days prior for the purpose of earning money to

travel to Colorado.[1] *Id*.

According to Mr. Reyes Filiciano, once he was in the United States, a friend of his—whose name he could not recall—told him to meet with Mr. Rodriguez Parra in Albuquerque because he had work he could do to earn money for travel. PSR ¶ 36. Mr. Reyes Filiciano relayed to the agents that he should have asked what kind of work it was because if he knew that it was related to drugs, he would not have accepted. *Id*. He stated that he did not know Mr. Rodriguez Parra or Mr. Gonzales Orduño very well—yet agents discovered via a search of his cellular phone that Mr. Reyes Filiciano had made two calls to Mr. Gonzales Orduño. *Id*. The agent then asked Mr. Reyes Filiciano why he knew the plastic bag behind his seat was what the agent wanted to see. *Id*. Mr. Reyes Filiciano then indicated that he knew the bag had contained drugs but that he did not know what kind. *Id*.

According to a DEA laboratory report, the net weight of the methamphetamine seized was 2,237 grams and the methamphetamine (actual) was 1,133 grams. PSR ¶ 37. Despite the facts as described, neither the case agent nor the government could establish that Mr. Reyes Filiciano played a mitigating role for the purposes of USSG §3B1.2. PSR ¶ 38.

## II.     As a career offender, Mr. Reyes Filiciano received the harshest sentence for his limited role in the conspiracy: 322 months.

In response to Mr. Reyes Filiciano's indictment, his appointed counsel, James P. Baiamonte, filed two pretrial motions.[2] The first requested complex case status so that Mr.

---

[1] Mr. Reyes Filiciano was allegedly in New Mexico to earn money to be able to go pay his respects to his first wife, Maria Balavas Carreras, who is interred in Colorado. Dkt. 103 at 13–14. While incarcerated on this matter, his second wife reportedly passed away. Dkt. 142 at 4, 19.

[2] Mr. Baiamonte passed away on March 4, 2020. *James "Jim" Baiamonte*, FRENCH FUNERALS & CREMATIONS, https://www.frenchfunerals.com/obituary/James-Baiamonte (last visited May 23, 2023).

Baiamonte could be paid in advance for the "suppression issue which had to be litigated[,] causing the attorney fees to approach the $7,000 statutory cap."[3] Dkt. 33 at ¶ 2. The suppression motion Mr. Baiamonte spoke of ended up being four pages long (11 numbered paragraphs), cited four cases, and requested the exclusion of statements made by Mr. Reyes Filiciano during his post-arrest interview.[4] Dkt. 34. The grounds for suppression were the involuntary nature of his waiver (including his *Miranda* rights being allegedly read to him in English, a lengthy period of pre-*Miranda* detention, and a lack of familiarity with American constitutional rights). *Id*. The government, represented by Jon K. Stanford (as it remains in the instant motion), filed a seven-page response asking Judge Black to deny the motion.[5] Dkt. 37. In it, the government clarified that Mr. Reyes Filiciano was in fact read his *Miranda* rights in Spanish, thus negating the principal argument raised in favor of suppression. *Id*. at 5. An evidentiary hearing was held on March 4, 2009. Dkt. 44. At the hearing, the government called the two DEA agents involved in questioning Mr. Reyes Filiciano. Dkt. 47. Judge Black orally denied the motion and instructed Mr. Stanford to prepare an order to that effect.[6] *Id*. That order—one paragraph in length—was filed on March 27. Dkt. 49. The entire proceeding lasted 27 minutes. Dkt. 44.

---

[3] Mr. Baiamonte would ultimately receive $7,992.70 for his work on this case. Dkt. 96 at 11.

[4] To produce these four pages, Mr. Baiamonte billed 28.3 hours—15.8 to research and 12.5 to draft—for a total of $2,830. Dkt. 96 at 6–7.

[5] Given Mr. Stanford's start date at the United States Attorney's Office (May 2008), this case may have been one of his very first. The Court recognizes that approaches to drug prosecutions have shifted in the last 15 years. However, the Court also notes that Mr. Stanford's thoughtfulness and professionalism have been constant throughout.

[6] "Well, other than the allegations in the brief, challenging Agent Chavez and Agent McCree, to a lesser extent, the defendant has produced nothing that would raise any question in the Court's mind as to the validity of the *Miranda* warnings. I will deny the motion to suppress. Mr. Stanford, if you'll prepare the order." Dkt. 47 at 23:20–24:1.

Mr. Reyes Filiciano appears to have been unwilling to settle this case immediately following Judge Black's ruling on his suppression motion. Mr. Gonzales Orduño, on the other hand, took advantage of the opportunity to cooperate and engaged in plea negotiations, *see* Dkt. 51, as did Mr. Rodriguez Parra.[7] *See* Dkt. 58. The trio's joint trial date was reset to July 6. Dkt. 53. A calendar call was held on June 25, where Judge Black scheduled a firm trial date of July 20. Dkt. 60. Following the new scheduling order, the government filed a flurry of paperwork in preparation for trial against Mr. Reyes Filiciano including, *inter alia*, a witness list that included three names: the two DEA agents and Mr. Gonzales Orduño. Dkt. 66. Mr. Gonzales Orduño signed a generous plea agreement on July 15 that ultimately got him out from under all three mandatory minimum sentences he faced in exchange for his cooperation. Dkt. 71. He received a sentence of 48 months.[8] Dkt. 85. Mr. Rodriguez Parra, meanwhile, was the first to cooperate with the government. His plea agreement, signed on June 11, rewarded him with a minor role adjustment under USSG §3B1.2 and the dismissal of the 18 U.S.C. § 924(c) charge (a mandatory consecutive five years).[9] Dkt. 58 at ¶¶ 7(d), 10(a). He was ultimately sentenced to the remaining

---

[7] As is common in multidefendant cases, the first to "flip" typically gets rewarded. So too are those who can provide the most valuable information to the government. In this case, Mr. Rodriguez Parra cooperated first and Mr. Gonzales Orduño—easily the most culpable *and* knowledgeable—provided the most valuable information (and received a downward departure pursuant to USSG §5K1.1, *see* Dkt. 75). Unable to offer cooperation against his coconspirators and too low in the operation to be able to provide any substantial assistance to the government, Mr. Reyes Filiciano ended up a sitting duck subject to some of the harshest federal drug sentences.

[8] Mr. Gonzales Orduño was released from custody (and subsequently deported) on November 28, 2011—roughly 11 and a half years ago. *Inmate Locator*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited May 23, 2023).

[9] If Mr. Rodriguez Parra was worthy of this adjustment, it only seems logical that Mr. Reyes Filiciano should have received it too. Yet as a career offender under USSG §4B1.1, he was ineligible. *See United States v. Jeppeson*, 333 F.3d 1180, 1184 (10th Cir. 2003).

counts' mandatory minimum: 120 months.[10] Dkt. 92.

Instead of holding a trial on July 20, Judge Black dismissed the venire and accepted an agreement in which Mr. Reyes Filiciano pleaded guilty to all three counts listed in the Indictment. Dkts. 73, 74. That change of plea hearing took 16 minutes. Dkt. 74. The plea appears to have offered Mr. Reyes Filiciano little benefit other than acceptance points and the government agreeing not to bring any 21 U.S.C. § 851 enhancement action against him.[11] Thereafter, the United States Probation Office prepared the PSR in this case; the PSR indicated, among other things, that Mr. Reyes Filiciano had approximately seven prior criminal convictions, six of which were drug possession or sale convictions. *See generally* PSR ¶¶ 54–60. This criminal history placed Mr. Reyes Filiciano in category VI, substantially affecting his Guidelines range. PSR ¶ 63. The PSR was disclosed on November 23, 2009.

Mr. Baiamonte subsequently filed a one-page sentencing memorandum on behalf of Mr. Reyes Filiciano on December 9. Dkt. 77. Bound by a plea agreement that prohibited him from asking for a variance, the memorandum requested a low-end Guidelines sentence of 322 months. *Id*. Mr. Baiamonte provided no mitigating evidence in support of his low-end request. *Id*. The

---

[10] Mr. Rodriguez Parra was released from custody (and subsequently deported) on June 9, 2017—roughly six years ago. *Inmate Locator*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited May 23, 2023).

[11] Given Judge Black's sentencing practice, *see* Dkt. 107 at 6:14–18 ("It is my practice normally to sentence at the low end of the range for those who do not go to trial, as I do not have all of the information and I've not been able to assess the credibility. It is my intent to do that [here].), acceptance of responsibility only gave Mr. Reyes Filiciano a 38-month reduction to what would have likely been his sentence had he gone to trial and lost (360 months). PSR ¶ 84. It seems highly unlikely that the government, in this case, would have pursued the § 851 enhancement (resulting a mandatory minimum of life). In fiscal year 2016, for example, only twenty people nationwide received life sentences as a result of this provision. *Application and Impact of 21 U.S.C. § 851: Enhanced Penalties for Fed. Drug Trafficking Offenders*, U.S. SENT'G COMM'N, https://www.ussc.gov/research/research-reports/application-and-impact-section-851-enhancements (July 2018).

government filed no response, and a sentencing hearing was held on January 21, 2010. Dkt. 87.

At the hearing, the government made no sentencing argument or recommendation to the Court.

Mr. Baiamonte initially only made this statement:

> Your Honor, I filed a very brief sentencing memorandum in this case, where I'm asking for the low-range advisory sentence that the Court could adjudge in this matter. And with that, I believe my client would like to address the Court.

Dkt. 107 at 3:10–14. Mr. Reyes Filiciano, in turn, made the following remarks:

> I would like to say – to suspend the court date because this gentleman [Mr. Baiamonte] has done nothing but lies in my case. Because he gave me all the papers in English and I didn't understand. When he would go to see me in Estancia, he would laugh at me and make fun of me that I had to take 22 years. He would say things like that to me; that if I was lucky, the judge would give me 22 years instead 24 or 35 years.
>
> And I sent Your Honor a letter. I don't know if he would have given it to you. But he made me sign. He tricked me with lies. The deal that we did was supposed to be for 10 years, and now he tells me it's 22 years.
>
> And I brought here what I sent him, and what he sent back to me. And he said – he threatened me. He said not to stand here and speak the day of the sentencing; that I should stand here for my answer and speak with the judge, that it would look bad if I did that, if I were to shout what I wanted.
>
> And so I sent Your Honor a letter with a motion asking to replace the attorney, because of the – his lies against me, because he is violating my rights.

*Id*. at 3:16–4:15. Judge Black asked Mr. Baiamonte to respond. *Id*. at 4:16.

> Your Honor, several things. I'll take them up. I've never threatened a client; this client or any other client.
>
> This plea was entered before you the day of the jury trial. The Court was very careful in the plea colloquy that no threats or promises or coercion were utilized against Mr. Reyes.
>
> Regarding the documents, he's correct the documents are given to him in English. However, I retain, at my own expense, a Spanish-speaking interpreter, and they are read to him in his native language of Spanish. I don't even ask reimbursement from the Court for that. It comes out of my pocket, to the tune of 50 bucks an hour.
>
> When I corresponded with Mr. Reyes, it is in English/Spanish. There is a computer

program that translates these documents into Spanish. I'm told that they are pretty good. It's not so much a language barrier we have here. Mr. Reyes is very disappointed that Congress has enacted the laws that Congress has enacted. And he's obviously very disappointed that his own criminal history is going to come to light.

When he references me trying to invoke his silence, what he's referring to, he'd informed me he was going to jump on a table and start shouting and create a commotion. I informed him that that probably would not be a good idea in his long-term – it may result in a longer sentence than perhaps he would like. I informed him the Court has sentencing discretion; there is a low range and a high range, and a number of sentences in between those two. And perhaps carrying on and being very impolite in court might not be in his long-term interests. And that's what I said about how to comport himself in a courtroom. I never told him he shouldn't speak.

And obviously I deny any allegation that I've ever lied to him.

*Id*. at 4:17–6:4.

Judge Black subsequently rejected Mr. Reyes Filiciano's assertions and notified him that he intended to sentence him at the low-end of the Guidelines range, as was his custom in cases that did not go to trial. *Id*. at 6:5–7:2. Mr. Reyes Filiciano made one last effort to have a new attorney appointed, Judge Black rejected it, and Mr. Reyes Filiciano went on to suggest that he had taken the plea involuntarily because he had just learned that his father had died. *Id*. at 7:3–8:11. Judge Black proceeded to find, pursuant to USSG §4B1.1(c), that Mr. Reyes Filiciano was a career offender and sentenced him to 322 months in federal prison followed by five years of unsupervised release. *Id*. at 8:23–10:4. The entire proceeding lasted 14 minutes. Dkt. 87. Between a suppression hearing, a plea hearing, and a sentencing hearing, Mr. Reyes Filiciano spent a total of 57 minutes in court. Those 57 minutes yielded nearly 27 years in federal prison (14,112,970 minutes).

### III.   Mr. Reyes Filiciano has unsuccessfully sought relief through other post-conviction avenues.

Prevented by his plea agreement from appealing his sentence on most grounds, *see* Dkt.

73 ¶ 12, Mr. Reyes Filiciano has since contested this outcome in several settings. First, via pro se

Motion to Vacate under 18 U.S.C. § 2255. Dkt. 103. There, the Magistrate Judge entered

Proposed Findings and a Recommendation Decision ("PFDR") endorsing denial of relief and

dismissal of the motion. Dkt. 110. Judge Black adopted the PFRD, denying the motion and

dismissing with prejudice on October 31, 2011. Dkts. 114, 115. Mr. Reyes Filiciano attempted to

appeal this decision to the Tenth Circuit, but those efforts were not fruitful. Dkt. 116.

On May 9, 2016, the case was reassigned to this Court. Dkt. 119. Simultaneously, Mr.

Reyes Feliciano filed a pro se motion to reduce sentence pursuant to 18 U.S.C. § 3582(c)(2).

Dkt. 124. He then field another Motion to Vacate and Correct Sentence under 28 U.S.C. § 2255

and a second motion for a sentence reduction. Dkts. 128, 131. The Court denied each. Dkts. 129,

135, 136. Finally, a motion to appoint counsel was filed on behalf of Mr. Reyes Filiciano on

October 10, 2020, who was then seeking to receive compassionate release under 18 U.S.C. §

3582(c)(1)(A). Dkt. 138. That motion was granted, and Justine Fox-Young was appointed on

November of that year. Dkts. 139, 140. The instant motion was filed by Ms. Fox-Young on July

25, 2022. Dkt. 142. Mr. Stanford responded on behalf of the government. Dkt 143. Ms. Fox-

Young replied on September 14, 2022. Dkt. 144. Mr. Reyes Filiciano wrote the Court on May 1,

2023 to check the status of his motion. Dkt. 147. He has been in custody since June 4, 2008—put

otherwise: 15 years and five days.

## LEGAL STANDARD

18 U.S.C. § 3582(c)(1)(A)(i), as amended in 2018 by the First Step Act, allows convicted

persons to move for a sentence reduction in the district court after exhausting Bureau of Prisons

("BOP") administrative remedies. *See United States v. Maumau*, 993 F.3d 821, 830 (10th Cir.

2021). A district court may grant a motion for the reduction of a sentence "if three requirements

are met: (1) the district court finds that extraordinary and compelling reasons warrant such a

reduction; (2) the district court finds that such a reduction is consistent with applicable policy

statements issued by the Sentencing Commission; and (3) the district court considers the factors

set forth in § 3553(a), to the extent that they are applicable." *Id.* at 831. However, because "the

Commission has been unable to comply with its statutory duty of promulgating a post-First Step

Act policy statement . . . the Sentencing Commission's existing policy statement is applicable

only to motions filed by the Director of the BOP, and not to motions filed directly by

defendants." *Id*. at 836–37; *see also United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir.

2021). Thus, district courts "possess the authority to determine for themselves what constitutes

'extraordinary and compelling reasons'" on defendant-filed motions, and are not bound by the

Commission's current policy statements. *Maumau*, 993 F.3d at 832, 836.

Still, courts may choose to look to the current policy statement—United States

Sentencing Guidelines §1B1.13—for non-binding guidance. *See United States v. Carr*, 851 F.

App'x 848, 853 (10th Cir. 2021) (noting that "it was within the district court's discretion to

conclude the application notes to USSG §1B1.13 still provided the best definition and

description of 'extraordinary and compelling reasons' under the circumstances" but that Tenth

Circuit case law required the district court to recognize that §1B1.13 was non-binding and to

"exercise its independent authority and discretion.").[12]

---

[12] Amendments to USSG §1B1.13 have finally been adopted and, unless Congress acts, a new
policy statement will go into effect on November 1, 2023. *See Amendments to the Sentencing
Guidelines*, U.S. SENT'G COMM'N, https://www.ussc.gov/sites/default/files/pdf/amendment-
process/reader-friendly-amendments/202305_RF.pdf (April 27, 2023).

**DISCUSSION**

On September 8, 2020, Mr. Reyes Filiciano petitioned the BOP for compassionate

release. Dkt. 142-3 at 3. On September 30, 2020, the warden of FCI Englewood denied the

request. *Id*. at 4–5. The government acknowledges that Mr. Reyes Filiciano appears to have

exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A), Dkt. 143 at 5, and the

Court finds that he has done so. The principal issue raised by Mr. Reyes Filiciano's motion thus

is whether he has demonstrated extraordinary and compelling reasons for early release that are

not outweighed by the relevant statutory sentencing factors. Mr. Reyes Filiciano argues that his

declining health and serious medical problems—including diabetes, hypertension, obesity,

hyperlipidemia (high cholesterol), chronic shoulder pain, and an anxiety disorder—justify his

compassionate release. *Id*. at 2. He also argues that his medical conditions make him highly

susceptible to severe illness and even death due to possible reinfection with the virus that causes

COVID-19. *Id*. The government opposes his motion. Dkt. 143.

I.     **Extraordinary and compelling circumstances exist that justify Mr. Reyes
       Filiciano's release.**

As a preliminary matter, the Court does not believe that, on its own, the threat to Mr.

Reyes Filiciano currently posed by the virus causing COVID-19 amounts to an extraordinary and

compelling circumstance.[13] With respect to the pandemic as we now experience it, "[t]he mere

existence of COVID-19 in society and the possibility that it may spread to a particular prison

alone cannot independently justify compassionate release." *United States v. Purify*, No. 20-CR-

---

[13] Importantly, May 11, 2023 marked the end of the federal COVID-19 Public Health Emergency
Declaration. *End of the Federal COVID-19 PHE Declaration*, CENTER FOR DISEASE CONTROL
AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html (last
accessed May 30, 2023).

05075, 2021 WL 5758294, at *4 (10th Cir. Dec. 3, 2021) (quoting *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020)). Similarly, courts regularly deny relief to incarcerated persons with comorbidities who have contracted and recovered from COVID-19. *See, e.g.*, *United States v. Lippke*, No. 15-CR-02491-WJ, 2021 WL 1169676, *4 (D.N.M. Mar. 26, 2021); *United States v. Hollins*, No. 15-CR-20100, 2021 WL 103017, at *2 (D. Kan. Jan. 12, 2021); *United States v. Sandoval-Flores*, No. 99-CR-00109-TC, 2020 WL 6562087, at *5 (D. Utah Nov. 9, 2020). The Court notes that Mr. Reyes Filiciano contracted the virus in August of 2020 and survived. Dkt. 142-2 at 59.

Also weighing against relief based on the pandemic is the rise in vaccinations. *See, e.g.*, *United States v. McRae*, No. 21-CR-04092, 2022 WL 803978, at *2 (10th Cir. Mar. 17, 2022) ("Given the effectiveness of COVID-19 vaccines, we agree ... that 'a defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine— does not present an "extraordinary and compelling reason" warranting a sentence reduction.'" (quoting *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021))); *United States v. Medina*, No. 15-CR-00352, 2021 WL 1986834, at *3 (D. Utah May 18, 2021) (collecting cases). *But see United States v. Cruz-Hernandez*, No. 09-CR-03072-MV, 2022 WL 3577082, at *3-4 (D.N.M. Aug. 19, 2022) (limiting *McRae* by holding that "when a movant shows individualized medical evidence of extraordinary and compelling vulnerability to COVID-19 despite vaccination, or when a movant demonstrates extraordinary and compelling factors beyond medical vulnerability, this Court may grant release").

Mr. Reyes Filiciano was vaccinated on January 7, 2021 and February 2, 2021. Dkt. 142-2 at 141. However, the CDC currently provides that an individual is "up to date" on the vaccine if they "have completed a COVID-19 vaccine primary series and received the most recent booster

dose" recommended for them by the CDC.[14] Updated boosters, which "are called 'updated'
because they protect against both the original virus that causes COVID-19 and the Omicron
variant BA.4 and BA.5," became available on September 2, 2022, for people aged 12 years and
older.[15] Based on the medical records provided, it appears that Mr. Reyes Filiciano has not
received an updated booster vaccine dose against COVID-19. While his vaccination status is still
significant, the Court accords it less weight because of the time that has passed since his most
recent dose and the fact that Mr. Reyes Filiciano may not have received an updated booster.

Comparing the medical conditions identified in Mr. Reyes Filiciano's BOP medical
records, which have been produced to the Court under seal, with the list of conditions identified
by the Centers for Disease Control and Prevention (the "CDC") as conditions known to increase
risk of severe COVID-19 symptoms, the Court observes that diabetes, mood disorders (including
anxiety disorders), obesity, and several precursors to heart disease (including hypertension and
hyperlipidemia) are listed among those conditions.[16] The Court also has reviewed BOP statistics
from FCI Victorville Medium I, the facility at which Mr. Reyes Filiciano is currently housed. Of
note, the Victorville complex has seen six incarcerated people and one staff member die of

---

[14] *Frequently Asked Questions About COVID-19 Vaccination*, CENTER FOR DISEASE CONTROL
AND PREVENTION, https://cdc.gov/coronavirus/2019-ncov/vaccines/faq.html (last accessed May
15, 2023).

[15] *Stay Up to Date with COVID-19 Vaccines Including Boosters*, CENTER FOR DISEASE CONTROL
AND PREVENTION, https://cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html (last
accessed May 23, 2023).

[16] *People with Certain Medical Conditions,* CENTER FOR DISEASE CONTROL AND PREVENTION,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-
conditions.html (last accessed May 25, 2023).

COVID-19.[17] Nonetheless, notwithstanding his medical conditions, the Court finds that Mr. Reyes Filiciano has not shown that the COVID-19 pandemic alone constitutes an extraordinary and compelling basis for his release.

Before turning to the reasons that *do* justify Mr. Reyes Filiciano's release, the Court must make one point clear. Mr. Reyes Filiciano first sought compassionate release near the peak of this global crisis—in early September of 2020. Dkt 142-2 at 3. He was appointed counsel—Ms. Fox-Young—to assist him with his motion on November 10, 2020. Dkt. 140. Had defense counsel filed this motion promptly, this Court, like many others, almost certainly would have granted it, based in part on the COVID-19 pandemic. *See, e.g.*, *United States v. Garcia*, No. 11-CR-569- CCB, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated individual's diabetes and hypertension constituted extraordinary and compelling circumstances); *United States v. Franco*, No. 12-CR-932-PAC, 2020 WL 4344834, at *2 (S.D.N.Y. June 24, 2020) (finding combination of diabetes, hypertension, and obesity to qualify as extraordinary and compelling reason for release from custody). But instead, Mr. Reyes Filiciano waited *one year, eight months, and 16 days* for a motion to be filed on his behalf and endured exceptionally harsh prison conditions. The Court is sensitive to punishing incarcerated individuals when their lawyers' delayed actions disadvantaged them. [18]

---

[17] *BOP COVID-19 Statistics*, BOP, https://www.bop.gov/coronavirus/covid19_statistics.html (last accessed May 25, 2023).

[18] *See also United States v. Atencio*, No. 03-CR-1014-MV-1 (D.N.M.). Mr. Atencio had filed a pro se motion citing failing health that included, *inter alia*, a heart condition, high blood pressure, and obesity. *Id*. Dkt. 200 at 1. Nearly one year after being appointed counsel, Mr. Atencio died at 63 from medical complications related to a cardiac episode before any motion was filed on his behalf. *Id*. Dkt. 207 at 1. Mr. Atencio, who was serving a life sentence for what essentially amounted to a large-scale marijuana distribution operation, was sentenced by Judge John E. Conway the very morning *Booker* was decided by the Supreme Court (doing away with mandatory sentencing under the Guidelines) in a hearing that lasted five minutes. *Id*. Dkts. 11,

Separate and apart from their potential interplay with the virus that causes COVID-19, the Court is concerned about Mr. Reyes Filiciano's current medical conditions.[19] Mr. Reyes Filiciano's medical records document that he suffers from type 2 diabetes, hyperlipidemia (high cholesterol), hypertension (high blood pressure), hyperglycemia (high blood glucose), obesity (BMI of 30.7), an anxiety disorder (including possible PTSD), reduced vision, dental problems, and chronic shoulder pain (exacerbated by a 2016 assault in prison). Dkt. 142-2 at 7, 9, 12, 14, 24, 50, 97–98. While incarcerated, he also contracted COVID-19 and recovered. *Id*. at 59. Additionally concerning to the Court, and unmentioned in any briefing, are Mr. Reyes Filiciano's possible prostate and colon cancer diagnoses. *Id*. at 79 ("This inmate is 4 months overdue for [chronic care clinic]. [T]he inmate has an elevated PSA and requires [an] MD assessment for possible prostate malignancy."), 124 ("Detection of blood in stool; early detection of colon cancer.").

Based on the evidence provided, the Court believes that Mr. Reyes Filiciano has, on balance, received appropriate medical care (in terms of both frequency and treatment modalities) at the BOP facilities to which he has been designated.[20] And yet it remains the case that Mr.

---

138. Today, nearly half of Americans, including all New Mexicans, live in states where recreational marijuana is legal. *See* Natalie Fertig et al., *Nearly half of Americans to reside in states where marijuana is legal*, Politico, Nov. 9, 2022, https://www.politico.com/news/2022/11/09/half-americans-state-marijuana-legal-00065987.

[19] The government "agrees that [Mr. Reyes Filiciano] suffers from conditions that the CDC recognizes as increasing the risk of an adverse outcome from COVID-19" but maintains that his vaccination status negates any serious risk to his health. Dkt. 143 at 10. Moreover, it maintains that Mr. Reyes Filiciano "does not suffer from a terminal illness or a condition that severely limits his ability to function in a correctional setting," and that his ". . . health conditions are being treated and managed by BOP . . ." *Id*. at 14.

[20] Mr. Reyes Filiciano notably refused treatment for his possible colon cancer on June 15, 2020, perhaps as a result of a fear of contracting COVID-19 during the height of pandemic. Dkt. 142-2-

Reyes Filiciano has serious chronic medical conditions, all of which have sprung up or worsened with his continued incarceration. Regarding his physical health in 2009, the year before he was formally transferred into BOP custody, Mr. Reyes Filiciano only reported discomfort and pain after breaking his hand and leg. PSR ¶ 74. Moreover, in his sentencing memorandum, Mr. Baiamonte raised no concerns for Mr. Reyes Filiciano's health. Dkt. 77. Today, some 15 years later, Mr. Reyes Filiciano's health problems are obvious and pose a danger to his long-term health and wellbeing irrespective of the threat that COVID-19 continues to pose to vulnerable segments of the population.

These physical health concerns are exacerbated by concerns the Court has for Mr. Reyes Filiciano's mental well-being. Courts as recently as this year have found that deteriorating mental and physical health conditions can be extraordinary and compelling reasons justifying release. *See, e.g.*, *United States v. Booker*, No. 18-CR-2611-GPC, 2023 WL 3186296, at *3 (S.D. Cal. May 1, 2023) ("The Court finds that serious mental health impairments can justify granting a motion for compassionate release, and the Court notes it is not bound by the Sentencing Commission's policy statement or any specific medical condition mentioned therein."); *United States v. Luquin*, No. 19-CR-00350-GPC, 2023 WL 2801196, at *3 (S.D. Cal. Apr. 5, 2023). Mr. Reyes Filiciano suffers from an anxiety disorder and possible PTSD, both of which cause the Court serious concern, as they can jeopardize Mr. Reyes Filiciano's long-term ability to provide self-care while in prison.

The decline of Mr. Reyes Filiciano's mental and physical health dovetails with another concern this Court recognizes as an extraordinary and compelling circumstance, namely, that the

---

at 124. However, the quality of his medical care no doubt suffered during the pandemic. *See, e.g.*, Dkt. 142-2 at 126 ("Institution on lock-down due to COVID-19.").

conditions of his confinement during the COVID-19 pandemic have resulted in a prison term that

was more severe than Judge Black could have contemplated when originally sentencing him in

2010. While Judge Black reportedly sought to carefully balance the information then available,

he could not have foreseen the restrictions that would be precipitated by the pandemic (including

lockdowns and curtailment of facility programming and visitation), nor the public health risks

faced by individuals like Mr. Reyes Filiciano who have spent the entirety of the pandemic in a

carceral setting, nor the length of time over which these risks and deprivations would persist.

 "[C]ourts reviewing motions for sentence modifications have considered the extent to

which onerous lockdowns and restrictions imposed by correctional facilities attempting to

control the spread of the virus have made sentences 'harsher and more punitive than would

otherwise have been the case.'" *United States v. Hatcher*, No. 18-CR-454-KPF-10, 2021 WL

1535310, at *3 (S.D.N.Y. Apr. 19, 2021) (quoting *United States v. Rodriguez*, 492 F. Supp. 3d

306, 311 (S.D.N.Y. 2020)). Indeed, "a day spent in prison under extreme lockdown and in fear of

contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in

prison. While not intended as punishment, incarceration in such conditions is, unavoidably, more

punishing." *United States v. Mcrae*, No. 17-CR-643-PAE, 2021 WL 142277, at *5 (S.D.N.Y.

Jan. 15, 2021). Consequently, courts that have been unwilling to grant compassionate release

based on the threat of COVID-19 in recent months have nonetheless done so for individuals who

have demonstrated that their imposed sentence was more severe than originally intended, due to

the pandemic. *See, e.g.*, *United States v. Oquendo*, No. 13-CR-357-KPF-1, 2023 WL 199609, at

*5 (S.D.N.Y. Jan. 17, 2023); *United States v. Barraza Payan*, No. 18-CR-422-KPF, 2022 WL

17757779, at *5 (S.D.N.Y. Dec. 19, 2022); *United States v. Francisco-Ovalle*, No. 18-CR-526-

AJN, 2022 WL 1094730, at *3 (S.D.N.Y. Apr. 12, 2022); *United States v. Lora*, No. 16-CR-44-

KPF-5, 2022 WL 1055749, at *5 (S.D.N.Y. Apr. 8, 2022); *United States v. Rodriguez*, No. 05-CR-960-JPO, 2022 WL 158685, at *4 (S.D.N.Y. Jan. 18, 2022). In such situations, courts have concluded that "pandemic-induced conditions of confinement can constitute extraordinary and compelling circumstances warranting compassionate release, particularly for defendants who have (i) served long sentences and (ii) been detained for the entirety of the pandemic." *Oquendo*, 2023 WL 199609, at *5.

So too this Court concludes that pandemic-induced conditions of confinement constitute "extraordinary and compelling" circumstances warranting compassionate release for certain defendants who have (i) served long sentences and (ii) been detained for the entirety of the pandemic. Here, there can be no serious dispute that, using the metric of his health, Mr. Reyes Filiciano has experienced harsher conditions of confinement than could have been anticipated. The Court thus finds that the length and totality of these conditions, coupled with his serious medical conditions and demonstrated mental and physical deterioration while incarcerated, amount to extraordinary and compelling circumstances under 18 U.S.C. § 3582(c)(1)(A)(i).

Lastly, it must be noted that Mr. Reyes Filiciano has demonstrated rehabilitation. As of 2016, he had completed 22 educational courses in a variety of subject areas, even though as a noncitizen he is ineligible for "time" credits under the First Step Act. Dkt. 131 at 2.[21] While

---

[21] Because Mr. Reyes Filiciano is a non-citizen, he is not entitled to access much of the BOP's programming, including RDAP or the Federal Prison Industries compensated job-training program. BOP Program Statement, *Psychology Treatment Programs*, at 23 (accessible at https://www.bop.gov/policy/progstat/5330_011.pdf); 28 CFR § 345.35(a). He also has limited access to occupational education programs and cannot be placed in a residential reentry center. 28 CFR § 544.51(b)(1) ("inmates under orders of deportation, exclusion, or removal may participate in an institution's occupational education program if Bureau resources permit after meeting the needs of other eligible inmates."); *see also United States v. Guerrero Buenrostro*, No. 12-CR-00670-LHK-16, 2020 WL 7773610, at *1 (N.D. Cal. Dec. 30, 2020) ("because Defendant has an active Immigration and Customs Enforcement detainer, he is ineligible for the

"[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason," the Court may consider it in combination with the other factors under the extraordinary and compelling standard. *McGee*, 992 F.3d at 1043 (quoting 28 U.S.C. § 994(t)). Taking all of these circumstances together, the Court concludes that extraordinary and compelling circumstances exist for release. It therefore proceeds to consider whether relief in the form of a reduced sentence is warranted in this case in light of the factors set forth in 18 U.S.C. § 3553(a).

II.     **The § 3553(a) factors weight in favor of Mr. Reyes Filiciano's release.**

In evaluating Mr. Reyes Filiciano's Motion for Compassionate release, the Court must also consider the 18 U.S.C. § 3553(a) factors, which include "the need for the sentence imposed":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Here, the Court finds that the factors set forth in 18 U.S.C. § 3553(a) support reducing Mr. Reyes Filiciano's term of imprisonment to time served.

a.   **The Offense**

With respect to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, Mr. Reyes Filiciano's offense was incredibly serious—it involved the distribution of methamphetamine, a drug that has destroyed many lives in our country. Moreover, a firearm was

---

twelve month reduction"). As a result, he will serve more time than someone facing precisely same sentence who is an American citizen.

involved in the transaction, raising the likelihood of violence. (Thankfully, no violence occurred, and the firearm found by law enforcement was unloaded.) However, as described *supra* Sections I–II (Background), Mr. Reyes Filiciano held the lowest position of authority in the conspiracy and was clearly the least culpable of the three men charged. Nonetheless, he received—and has served—the harshest sentence.

### b. Deterrence

While Mr. Reyes Filiciano's offense was incredibly serious, his punishment has been grave—especially compared to his coconspirators who have been out of custody for the last six and 11 years, respectively. Having himself spent over 15 years in custody—five times more than he has ever served before—Mr. Reyes Filiciano has already served a substantial term of incarceration for deterrence purposes. During that time, he has experienced profound loss, including the death of his wife. Dkt. 144 at 3. He was unable to be with her before she passed or attend her funeral. Additionally, in the past 15 years he has been unable to provide care for his daughter. Dkt. 142 at 4. During his incarceration, Mr. Reyes Filiciano has also endured serious medical issues, addressed *supra* Section I (Discussion).

Additionally, as described *supra* Section I (Discussion), Mr. Reyes Filiciano has been incarcerated for the entirety of the COVID-19 pandemic. During that time, he has been deprived of rehabilitative programming while detention facilities have cycled in and out of lockdowns. Additionally, he has faced increased exposure to—and contracted—COVID-19, which presents serious risks for him in light of his age and underlying medical conditions. In each of these ways, Mr. Reyes Filiciano has been severely punished.

### c.   Danger to the Community

The danger that Mr. Reyes Filiciano presents to the community appears to be the government's primary § 3553(a) concern. *See* Dkt. 143 at 17–19 ("[Mr. Reyes Filiciano's] lengthy criminal history . . . which includes [six] prior drug trafficking convictions, and the offense conduct in this case demonstrate[] that he would pose a danger to public safety if released."); ("Simply put, [Mr. Reyes Filiciano] presents as a career offender who has never shown signs of slowing or stopping his criminal behavior. [His] criminal conduct has spanned three decades and there is no evidence he will not resume criminal activity when he is released.").

Mr. Reyes Filiciano's criminal history indeed raises concerns. He has approximately seven prior criminal convictions, six of which were drug possession or sale convictions. *See generally* PSR ¶¶ 54–60. This criminal history places Mr. Reyes Filiciano in category VI and substantially affected the Guidelines range under which he was sentenced. PSR ¶ 63. However, these prior cases all involved small quantities of cocaine (.45 and 2.89-gram rocks, "one rock", "a small bag") that indicate street-level dealing in Los Angeles as opposed to large-scale, interstate distribution. PSR ¶¶ 56–59. The last street-level transaction occurred well over 16 years ago. PSR ¶ 60. The Court believes that the deterrent effect of the last 15 years in custody should assuage concerns about Mr. Reyes Filiciano's danger to the community.

The Court also notes that Mr. Reyes Filiciano—who is now 53 years old—faces a reduced risk of recidivism based on his age. According to a study from the Sentencing Commission, over an eight-year period, just 26.8 percent of 50- to 59-year-olds recidivated—in

striking contrast to 67.6 percent of those under age 21.[22] These decreased rates held true regardless of the length of sentence imposed. *Id.* Additionally, Mr. Reyes Filiciano will be deported immediately following his release, further reducing his risk of recidivism in the United States. Together, these realities suggests that his risk of recidivism is generally low. However, the Court must be exceedingly clear: Mr. Reyes Filiciano must not return to the United States. If he does, this Court may sentence him to a period of significant incarceration. (*El señor Reyes Filiciano no debe regresar a los Estados Unidos. Si lo hace, este Tribunal puede condenarlo a un período de encarcelamiento significativo.*)

### d. Rehabilitation

As previously mentioned, a court cannot grant compassionate release solely on the basis of rehabilitation. "'Rehabilitation of the defendant alone,' Congress has stated, 'shall not be considered an extraordinary and compelling reason.'" *McGee*, 992 F.3d at 1043 (quoting 28 U.S.C. § 994(t)). However, while it is not a standalone justification for compassionate release, courts may appropriately consider rehabilitation on a motion for compassionate release. *See, e.g.*, *United States v. Eccleston*, No. CR 95-0014-JB, 2021 WL 2383520, at *35 (D.N.M. June 10, 2021) (Browning, J.) (counting "rehabilitative efforts" as one factor constituting extraordinary and compelling circumstances). Here, Mr. Reyes Filiciano has demonstrated rehabilitation throughout his 15-plus years in custody. As of 2016, he had completed 22 educational courses in a variety of subject areas, even though as a noncitizen he is not entitled to receive time credits under the First Step Act. Dkt. 131 at 2.

---

[22] KIM STEVEN HUNT & BILLY EASLEY II, U.S. SENT'G COMM'N, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS 3 (2017).

Thus, a holistic review of the § 3553(a) factors compels the Court to reduce Mr. Reyes Filiciano's term of imprisonment. The offense in this case was undoubtedly serious: law enforcement recovered 2,601.2 gross grams of methamphetamine through a buy-and-bust operation. However, the Court believes that keeping Mr. Reyes Filiciano in custody for the remainder of his term of imprisonment would fail to meaningfully advance the purposes of sentencing.

## CONCLUSION

For the reasons stated above, Mr. Reyes Filiciano's Motion for Compassionate Release, Dkt. 142, is hereby **GRANTED**. Exercising its authority under 18 U.S.C. § 3582(c)(1)(A)(i), the Court will reduce his term of imprisonment to time served. The BOP is directed to release Mr. Reyes Filiciano to the custody of ICE so that removal proceedings may begin. The government shall serve a copy of this order on the Warden at FCI Victorville Medium I immediately.

ENTERED this 8 day of June 2023.

_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE